IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

MIDWAY LEASING, INC.,
a New Mexico corporation,

      Plaintiff,

v.

                                                    CIV 18-0132 KBM/KK

WAGNER EQUIPMENT CO.,
a Colorado corporation,

      Defendant.

# **MEMORANDUM OPINION AND ORDER**
# **GRANTING PARTIAL SUMMARY JUDGMENT**

THIS MATTER comes before the Court on Defendant's Motion for Partial Summary Judgment on Affirmative Defense Based on Public Policy (*Doc. 33*), filed September 6, 2018. Pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73(b), the parties have consented to me serving as the presiding judge and entering final judgment. *Docs. 8, 9, 10.* Having reviewed the submissions of the parties and the relevant law, and having conducted oral arguments, the Court will grant Defendant's Motion for Partial Summary Judgment. Specifically, the Court finds that a contingency fee agreement for lobbying before the County Commission would be unenforceable as in contravention of New Mexico's public policy.

    I.      **BACKGROUND**

Plaintiff Midway is a real estate agency and developer, while Defendant Wagner is a business that assembles, sells, and leases construction equipment. According to Midway, the parties entered into an agreement in 2015 in which Midway would assist

Wagner in securing the approval of Industrial Revenue Bonds ("IRBs") to be issued by Bernalillo County. Plaintiff maintains that an unwritten IRB agreement reached in October 2015 requires that each year Wagner incurs property tax savings from the IRB awards, Wagner must pay Midway 18% of such savings. Wagner denies that the parties entered into the IRB agreement as described by Midway. Nevertheless, for purposes of this partial summary judgment motion only, Wagner "will accept as true Midway's allegation that the parties agreed to a fee based on a percentage of the tax savings Wagner will enjoy as a result of the IRBs." *Doc. 34* at 2.

Midway's suit against Wagner sets forth the following theories for recovery of damages: (1) breach of contract, (2) unjust enrichment, and (3) quantum meruit. Wagner now moves for summary judgment on the breach of contract claim based on its affirmative defense that the contingency payment term of the parties' contract, as alleged by Midway, is unenforceable on public policy grounds.

## II. SUMMARY JUDGMENT STANDARD

Pursuant to Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The movant bears the initial burden of making a prima facie demonstration of the absence of a genuine issue of material fact and entitlement to judgment as a matter of law." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670-71 (10th Cir. 1998). The burden then shifts "to the nonmoving party to show that there is a genuine issue of material fact." *Bacchus Indus., Inc., v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991).

A "genuine" dispute exists where the evidence is such that a reasonable jury could resolve the issue either way. *See Adler*, 144 F.3d at 670 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A mere scintilla of evidence in the non-movant's favor is not sufficient. *Anderson*, 477 U.S. at 252. "When applying this standard, the Court examines the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment." *Hartwell v. Sw. Cheese Co.*, No. CV 15-1103 JAP/GJF, 2017 WL 944125, at *2 (D.N.M. Jan. 23, 2017). "Summary judgment is not 'a disfavored procedural shortcut but rather [it is] an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action.'" *Garcia v. Vilsack*, 628 F. Supp. 2d 1306, 1308-09 (D.N.M. 2009) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986)).

Both the movant and the party opposing summary judgment are obligated to "cit[e] to particular parts of materials in the record" to support their factual positions. Fed. R. Civ. P. 56(c)(1)(A). In this district, "[a]ll material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted." D.N.M.LR-Civ. 56.1(b). Here, Plaintiff Midway does not specifically controvert the material facts set forth by Defendant Wagner, but rather argues that some of Wagner's facts are not material and should be disregarded. *Doc. 37* at 5-6. However, "the substantive law will identity which facts are material." *Amparan v. Lake Powell Car Rental Cos.*, 882 F.3d 943, 947 (10th Cir. 2018). Moreover, Plaintiff also does not set forth any of its own undisputed material facts. Instead, it provides a factual background that includes information about Wagner's prior business dealings, which are irrelevant to this motion.

3

*See Doc. 37* at 2-5. Defendant's material facts are thus deemed undisputed, and there are no genuine disputes as to any fact material to the resolution of Defendant's Motion.

### III. UNDISPUTED MATERIAL FACTS

Between 2012 and 2015 Wagner acquired land in Albuquerque to build a new facility. *Doc. 34*, Undisputed Material Fact ("UMF") D. In June 2015, Midway and Wagner entered into a consulting agreement whereby Midway would perform advisory services in connection with Wagner's development of its new property in Bernalillo County. UMF E. On July 29, 2015, Midway and Wagner reached an additional agreement, beyond the initial consulting agreement, for Midway to assist Wagner in obtaining IRBs from the County for Wagner's new property. UMFs J, K. As compensation, Midway asserts that Wagner agreed to pay it 18% of the property tax savings from the IRB awards each year for the succeeding 30 years. UMFs W, X. Midway's calculation for the value of its services on the IRB project is 'the present value of the agreed percentage of actual tax savings realized by Wagner over the life of the IRBs." UMF CC.

Midway described its duties on the IRB project as both administrative and political. UMF O. Midway's administrative duties included coordinating Wagner's provision of information to the County to facilitate the County's evaluation of Wagner's IRB application. UMF P. Midway's political duties included working to obtain three votes of the Bernalillo County Commission in order to ultimately obtain IRBs from the County of Bernalillo. UMFs Q, S. Midway did this by communicating with Commissioners, providing them information, answering their questions, and persuading them that Wagner's project was a good use of the County's IRB incentives. UMF Q. These

4

political activities clearly fall within the definition of lobbying. *See, e.g.*, Black's Law Dictionary (6th ed. 1990) (stating that "lobbying" means "[a]ll attempts including personal solicitation to induce legislators to vote in a certain way or to introduce legislation"); *see also* NMSA § 2-11-2(D) (stating that the definition of "lobbying" includes "attempting to influence . . . an official action").

Midway's principal, D. McCall, "believed he could lay the groundwork to make sure that [Wagner] obtained a majority vote on the county commission." UMF Q. Indeed, the Bernalillo County Commission unanimously approved Wagner's IRB application on October 27, 2015, and the County enacted an ordinance authorizing issuance of the IRBs. UMF Z.

**IV.    ANALYSIS**

New Mexico has a strong public policy in favor of freedom of contract.[1] *Berlangieri v. Running Elk Corp.*, 2003-NMSC-024, ¶ 20, 76 P.3d 1098. However, "[c]ontracts in violation of the public policy of the state cannot be enforced." *City of Artesia v. Carter*, 1980-NMCA-006, ¶ 12, 610 P.2d 198. Contracts "are not to be held as void being contrary to public policy, unless they are clearly contrary to what the legislature or judicial decision has declared to be the public policy, or they manifestly tend to injure the public in some way." *K.R. Swerdfeger Constr. v. UNM Bd. of Regents*, 2006-NMCA-117, ¶ 23, 142 P.3d 962 (citing *Berlangieri v. Running Elk Corp.*, 2002-NMCA-060, ¶ 11, 48 P.3d 70, *aff'd*, 2003-NMSC-024). To ascertain public policy, the

---

[1] Defendant removed this case to federal court under diversity jurisdiction. *Doc. 1* at 2-3. This Court, therefore, must apply New Mexico law on substantive matters. *See Wade v. EMCASCO Ins. Co.*, 483 F.3d 657, 665 (10th Cir. 2007) (citations omitted).

court can "look to the language of [a] statute, its subject matter and the purpose to be accomplished." *Artesia*, 1980-NMCA-006, ¶ 12.

New Mexico's Lobbyist Regulation Act includes a provision that "[n]o person shall accept employment as a lobbyist and no lobbyist's employer shall employ a lobbyist for compensation contingent in whole or in part upon the outcome of the lobbying activities before the legislative branch of state government or the approval or veto of any legislation by the governor." N.M. Stat. Ann. § 2-11-8. The plain language of this statute only prohibits contingent fee agreements for lobbying before the state legislature or governor. But, at issue in this case is Midway's alleged lobbying before the Bernalillo County Commission. Defendant Wagner suggests that Section 2-11-8 reflects a broader common law public policy against contingency fee agreements that should extend to legislative lobbying efforts before any of the State's political subdivisions.

Accordingly, Wagner asserts that even if it had agreed to pay Midway 18% of its property tax savings from the IRBs awarded by the Bernalillo County Commission, such an agreement should be void as contrary to public policy. Midway, on the other hand, asserts that Defendant Wagner is asking the Court to improperly expand the scope and import of Section 2-11-8.

The United States Supreme Court has expressed a public policy disfavoring lobbying contingency fee agreements because such agreements increase the likelihood of corruption. In *Providence Tool Co. v. Norris*, 69 U.S. 45, 55 (1864) the Court explained that

> [l]egislation should be prompted solely from considerations of the public good, and the best means of advancing it. Whatever tends to divert the attention of legislators from their high duties, to mislead their judgments, or to substitute other motives for their conduct than the advancement of the

6

public interests, must necessarily and directly tend to impair the integrity of our political institutions. Agreements for compensation contingent upon success, suggest the use of sinister and corrupt means for the accomplishment of the end desired. The law meets the suggestion of evil, and strikes down the contract from its inception.

While the Court in *Providence Tool* expressed general disfavor towards all lobbying, it "specifically held that contracts to lobby for a legislative result, with the fee contingent on a favorable legislative outcome, were void *ab initio* as against public policy." *Fla. League of Prof'l Lobbyists, Inc. v. Meggs*, 87 F.3d 457, 462 (11th Cir. 1996) (holding that *Providence Tool* is still binding precedent). In *McCurdy Group, LLC v. American Biomedical Group, Inc.*, Judge Lucero in his dissent noted that *Providence Tool* articulates "[t]he broad and long-standing policy against contingent fees . . ." in order to "prevent[] the use of personal influence in obtaining public contracts." 9 Fed. App'x 822, 834 (10th Cir. 2001) (Lucero, J., dissenting).[2]

The public policy expressed in *Providence Tool* applies in New Mexico. "In 1876 . . . the New Mexico Territorial Legislature adopted 'the common law as recognized in the United States as the law of New Mexico.'" *Estate of Brice v. Toyota Motor Corp.*, 2016-NMSC-018, ¶ 9, 373 P.3d 977 (quoting N.M. Stat. Ann. § 38-1-3 (1876)). The common law public policy in *Providence Tool*, as expressed by the United States Supreme Court in 1864, was therefore adopted as the public policy in New Mexico.[3]

---

[2] The defendant in *McCurdy* argued that an agreement between the parties was unenforceable under a federal law which prohibits contingency fee agreements for the procurement of government contracts. *McCurdy*, 9 Fed. App'x at 829. The majority held that because it did not have a complete trial transcript, it could not review the lower court's decision on this issue. *Id.* Judge Lucero dissented, finding that "the record before us adequately demonstrates the illegality of the parties' agreement and thus [he] would reach and consider the question of the legality of contingent fee agreements with selling agents to obtain government contracts." *Id.* at 833-34.

[3] As Defendant concedes, "the New Mexico courts and legislature were free to discard the *Providence Tool* rule, if they determined that the needs of the state called for a different rule." Doc. 39 at 8; *see eg. Lopez v. Maez,* 1982-NMSC-103, ¶ 6 ("the common law as recognized by the United States is the rule of

Additionally, by prohibiting contingency fee agreements for lobbying before the state legislature in Section 2-11-8, the New Mexico legislature expressed the same public policy purpose as addressed by the Supreme Court in *Providence Tool*. Indeed, "[e]very statute is a manifestation of some public policy. Just because the Legislature did not expressly include a statement of what the public policy is in the text of the statute does not mean that it does not intend to further a strong public policy." *First Baptist Church of Roswell v. Yates Petroleum Corp.*, 2015-NMSC-004, ¶ 12, 345 P.3d 310. That purpose, to prevent corruption in lobbying, applies the same whether lobbying is before the state legislature or the county commission. Similarly, the Court in *Hazelton v. Sheckles*, addressing contingency fee agreements for procuring government contracts, explained that "there is no real difference in principle between agreements to procure favors from legislative bodies, and agreements to procure favors in the shape of contracts from the heads of department," because "all contracts for a contingent compensation for obtaining legislation [are] void . . . ." 202 U.S. 71, 79 (1906) (discussing *Providence Tool*). Accordingly, the public policy expressed in Section 2-11-8 by the New Mexico legislature voids the contingency fee agreement for lobbying before the County Commission at issue here, even though the plain language of the statute only applies to lobbying before the state legislature.

---

practice and decision in New Mexico, except if it has been superseded or abrogated by statute or constitution or held to be inapplicable to conditions in New Mexico"). The *Lopez* case provides one such example – New Mexico courts rejected the common law and imposed dram shop liability on a tavern owner negligently overserving alcohol to a patron who then injures a third-party. The Court is unaware of any New Mexico court decision discarding the common law prohibition against contingency fees for legislative lobbying activities.

The scope of the public policy expressed in Section 2-11-8 has not been addressed by New Mexico Courts.[4] However, other state courts have addressed similar issues and have come to the same public policy conclusion as this Court. In *Rome v. Upton*, the Appellate Court of Illinois invalidated a contingency fee contract for lobbying for tax revenue bonds with the city council. 271 Ill. App. 3d 517, 520 (1995). While the Illinois statute only prohibited contingency fee agreements for lobbying before the state legislature, the court found that the legislature intended to cover contingency fee agreements for lobbying at any level, including city council. *Id.* In doing so, the court held that "[a]ll agreements whose object or tendency is improperly to interfere with or influence legislative action, either by congress, the General Assembly, or by a city council or other body, are contrary to public policy and void." *Id.* (citing *In re Browning*, 23 Ill.2d 483, 494 (1961)).

Similarly, the Oklahoma Court of Civil Appeals found a lobbying contingency fee contract void as contrary to public policy because public policy held that such agreements "increase[] the potential for abuse in public decision-making." *Sholer v. Oklahoma ex. rel. Dep't. of Pub. Safety*, 2006 OK Civ. App. 145, ¶ 22, 149 P.3d 1040. The state statute did not expressly apply, but the court noted that it "only cited the statute to demonstrate the State's general public policy against contingent fee lobbying contracts." *Id.* ¶ 22 n.6.

---

[4] When no controlling state decision exists, "the federal court must attempt to predict what the state's highest court would do." *Wade*, 483 F.3d at 666 (citation omitted). In doing so, the federal court can seek guidance from "decisions rendered by lower courts in the relevant state, appellate decisions in other states with similar legal principles, district court decisions interpreting the law of the state in question, and the general weight and trend of authority in the relevant area of law." *Id.* (citations omitted).

In contrast, the Northern District of Ohio held, in part, that a contract that fell outside the plain language of the state's contingency fee prohibition statute would not be considered contrary to public policy. *Nat'l Strategies, LLC v. Naphcare, Inc.*, No. 10-cv-0974, 2011 WL 3419635, * 7 (N.D. Ohio Aug. 4, 2011). However, under New Mexico law, public policy looks not only at the four corners of the statute, but at the purpose behind the statute. *See Armijo v. Cebolleta Land Grant*, 1987-NMSC-006, ¶¶ 8-9, 732 P.2d 426 (a statute not strictly applied can still "represent a codification of the common law principle which voided certain contracts as violative of public policy.").

Midway cites *K.R. Swerdfeger Construction* to argue that that "only where a contract ***expressly*** violates a statute or legal precedent will it be held to violate public policy." *Doc. 37* at 7 (emphasis added). Indeed, in *K.R. Swerdfeger Construction*, the New Mexico Court of Appeals noted that the court has "recognized public policy violations where a contract expressly violates a statute." 2006-NMCA-117, ¶ 23 (citations omitted). In *K.R. Swerdfeger*, the relevant statute dealt with an owner's responsibility to mark underground facilities before another party began excavation. *Id.* ¶ 3. When an arbiter found that an owner could delegate that duty, the plaintiff argued that such a finding violated New Mexico public policy because the statute at issue did not expressly or impliedly permit delegation. *Id.* ¶¶ 6, 10. The court declined to find a violation of public policy "based simply on the absence of language [in the statute] expressly allowing delegation." *Id.* ¶ 24. In contrast here, Wagner is not requesting the Court find a public policy violation based on the absence of language, but rather on the clear language of Section 2-11-8.

At oral arguments, Midway posited that the New Mexico legislature could have made Section 2-11-8 apply to local governments, if that had been its intention. But since it did not, Midway maintains that this Court should not expand the scope of the public policy expressed in Section 2-11-8. To illuminate this argument, Midway pointed to Section 10-16-13 on the New Mexico statutes, which prohibits state agencies *and* local government agencies from accepting certain kinds of bids. In contrast, the legislature wrote Section 2-11-8 to apply to lobbying before the state government without any reference to local governments. However, Section 10-16-13 falls under general rules of conduct for all public officers and employees. *See* N.M. Stat. Ann. §§ 10-16-1 to -18. In comparison, Section 2-11-8 is part of a set of rules governing conduct in the state legislature. *See* N.M. Stat. Ann. §§ 2-1-1 to 2-20-2. It therefore follows that Section 2-11-8 would not address local governments when the chapter is specific to the state legislature. Thus, the Court is persuaded that the public policy expressed in Section 2-11-8 can apply beyond the four corners of the statute, to local governments. *See Armijo*, 1987-NMSC-006, ¶¶ 8-9.

While this Court has previously declined to expand public policy beyond the plain language of a statute (*see Herndon v. Best Buy Co., Inc.*, No CIV 14-0162 KBM/RHS, 2014 WL 4813610, *5 (D.N.M. Aug. 12, 2014)), the public policy before the Court now presents a quite different circumstance. At issue in *Herndon* was a statute concerning the retaliatory discharge exception to at-will employment. *Id.* at *1. The Court found that expanding public policy beyond the plain language of the statute at issue – New Mexico's Criminal Offender Employment Act – would "in effect, severely limit at-will

employment in New Mexico, an at-will employment state." *Id.* at *5 (citation omitted).[5] In contrast here, applying the public policy behind Section 2-11-8 beyond the statute's plain language does not severely limit the freedom to contract. Rather, it creates a narrow exception to that freedom in a very specific circumstance – when a contingency fee agreement for lobbying is at issue.

Although New Mexico favors the freedom to contract, lobbying contingency fee agreements are clearly contrary to New Mexico's public policy. That Bernalillo County has not addressed contingency fee agreements in an ordinance, or that the penalty for violating Section 2-11-8 is relatively minor, does not undermine New Mexico's public policy against such agreements.

Midway does not dispute that under the alleged IRB agreement providing for a contingency fee, it engaged in lobbying the Bernalillo County Commission to issue the IRBs. Because the Court finds such lobbying pursuant to a contingency fee agreement to contravene New Mexico's public policy, Wagner has shown that it is entitled to summary judgment as a matter of law on its affirmative defense to Midway's breach of contract claim.

Wherefore,

---

[5] The Tenth Circuit affirmed on appeal indicating,

> we are mindful that as a federal court, we shouldn't "expand New Mexico law in a manner that the state courts have not, ***especially*** when such an expansion would, in effect, severely limit at-will employment in New Mexico, an at-will employment state." *Gonzales v. City of Albuquerque*, 849 F.Supp.2d 1123, 1171 (D.N.M.2011), *aff'd*, 701 F.3d 1267 (10th Cir.2012). We agree with the district court that New Mexico has not recognized a clear public policy mandate restricting private employers from deciding not to hire convicted felons or for terminating an employee for making such a hire.

*Herndon v. Best Buy Co., Inc,* 634 F. App'x 645, 648 (10th Cir. 2015) (emphasis added).

IT IS HEREBY ORDERED that the Defendant's Motion for Partial Summary Judgment on Affirmative Defense Based on Public Policy (*Doc. 33*) is **granted**. Summary Judgment is hereby entered for Defendant as to Count I (breach of contract) of Plaintiff's Complaint.

_____
UNITED STATES MAGISTRATE JUDGE
Presiding by Consent