IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

MIDWAY LEASING, INC.,
a New Mexico corporation,

      Plaintiff,

v.                                    CIV 18-0132 KBM/KK

WAGNER EQUIPMENT CO.,
a Colorado Corporation,

      Defendant.


# COURT'S FINDINGS OF FACT AND CONCLUSIONS OF LAW

THIS MATTER came before the Court on a bench trial held December 3-4, 2018. Attorneys Alan Wilson and Alexandra Jones appeared for Plaintiff Midway Leasing, Inc. ("Midway"), and Attorneys Elizabeth Heaphy and Robert Muehlenweg appeared for Defendant Wagner Equipment Company ("Wagner"). The Court has given due consideration to the testimony received and the admitted exhibits and has reviewed the transcript of the proceedings *(Docs. 60 & 61)*, the proposed findings of fact and conclusions of law submitted by the parties *(Docs. 63 & 64)*, and relevant authorities. Having further heard the arguments of counsel on February 20, 2019, the Court now sets forth its Findings of Fact and Conclusions of Law.

# FINDINGS OF FACT

## I. The Parties

1. Plaintiff Midway is a New Mexico corporation, with its principal place of business in Bernalillo County, New Mexico, and its sole owner and president is Mr. D. McCall. *Undisputed; McCall Testimony, Trial Transcript ("Trial Tr."), Vol. I, 45:10-14.*

2. Midway owns, leases, finances and develops commercial real estate as well as provides consulting services in all aspects of real estate development. *McCall Testimony, Trial Tr., Vol. I, 45:10-14.*

3. Defendant Wagner is a heavy equipment dealer based in Colorado that has transacted business in New Mexico since 2002 when it purchased Rust Tractor, the Caterpillar dealership then owned by Jack Rust. *Wagner Testimony, Trial Tr., Vol. II, 398:22-399:13.*

4. Bruce Wagner has served as Wagner's president and chief operating officer for at least twelve years. *Wagner Testimony, Trial Tr., Vol. II, 398:14-21.*

## II. Wagner Engages Midway's Services for South Valley Project

### A. The Consulting Agreement

5. The instant dispute involves the development of real estate located at Rio Bravo Blvd NW and I-25 in the South Valley of Albuquerque in Bernalillo County. *Undisputed.*

6. For many years, Wagner has maintained its Albuquerque-area headquarters at a facility on Osuna Road (4000 Osuna Road NE). *Wagner Testimony, Trial Tr., Vol. II, 399:14-16.*

7. By 2015, Wagner had acquired the South Valley property on which it planned to construct a new facility for conducting its Albuquerque-based operations. *Wagner Testimony, Trial Tr., Vol. II, 399:17-400:1.*

8. In the spring of 2015, Wagner was also building a new facility in Bloomfield, New Mexico and two of its employees – Kevin Pomeroy and Chris Foster – were tied up with the development of that project. Thus, Wagner needed outside assistance to get the South Valley development project moving. *Wagner Testimony, Trial Tr., Vol. II, 400:23-401:11.*

9. Bruce Wagner and McCall met in about 2010 when both were involved in helping young people show livestock at various competitions, and they developed a friendship. *McCall Testimony, Trial Tr., Vol. I, 53:8-19; Wagner Testimony, Trial Tr., Vol. II, 400:6-15.*

10. In early 2015, Bruce Wagner informally requested, and received, some assistance from McCall with that South Valley development because McCall has extensive experience in commercial real estate development and management. *McCall Testimony, Trial Tr., Vol. I, 54:2-55:18.*

11. In spring 2015, McCall insisted on a written contract with Midway setting forth compensation if Defendant wanted McCall to continue to assist in those development efforts, and a "Consulting Agreement" was executed in June 2015. *McCall Testimony, Trial Tr., Vol. I, 55:19-56:4; Exhibit S.*

12. Pursuant to the written Consulting Agreement, Midway's compensation for McCall's development services was based on 1½% of the construction costs for the South Valley project. *Exhibit S.*

***B. Work on Getting the Industrial Revenue Bonds (IRBs)***

13. During the time it was considering buying the South Valley property, Wagner employees discussed with Bernalillo County representatives, including Mayling Armijo, the director of its Economic Development Department, economic incentives including the potential availability of IRBs. *Pomeroy Testimony, Trial Tr., Vol. II, 291:20-23; 292:20-293:12.*

14. The IRB program is designed to encourage and incentivize businesses to undertake industrial projects in Bernalillo County. Businesses that build and equip facilities under the auspices of the program can obtain certain benefits, including property tax exemptions. No public financing was involved in Wagner's South Valley project. *Perry Bendicksen Testimony, Trial Tr., Vol. I,181:25-182:10; McCall Testimony, Trial Tr., Vol. I, 55:25-56:6.*

15. Wagner decided in about July 2015 that it should look more closely at whether to apply to participate in the County's IRB program, and Wagner employees asked McCall to look into the IRB application process. *Pomeroy Testimony, Trial Tr., Vol. II, 321:1-321:18; 332:6-24.*

16. McCall had previously worked on only one other IRB application involving Moncor, but it was unsuccessful. Although he did not consider himself to be an expert on IRBs in July 2015, he certainly was familiar at that time with such entitlements as well as other discretionary programs and economic incentives. He also had negotiation experience and regularly worked with County and State entities and elected officials in the area of real estate development. *McCall Testimony, Trial Tr., Vol. I, 135:20-136:9; Trial TR., Vol. I, 45-48.*

17. On July 28, 2015, McCall sent an email about IRBs to Kevin Pomeroy, Wagner's Facilities & Maintenance Manager. The email stated, in part:

> I have scheduled a meeting at 1:30 at Art De La Cruz County Commissioner's office [on July 29], if there is any way possible can you see if [Wagner's CEO, Bruce Wagner] would consider going. I think this is a meeting where we can get on the table what they can offer for the IRB's such as property tax exemptions, gross receipts on construction and whatever else they may have available. This would be a great kickoff start.

*McCall Testimony, Trial Tr., Vol. I, 141:16-25; Exhibit B.*

18. McCall arranged a July 29, 2015 "kickoff" meeting with Commissioner De La Cruz and other County representatives at which Bruce Wagner, Kevin Pomeroy and McCall also attended. *Pomeroy Testimony, Trial Tr., Vol. II, 333:6-13; Wagner Testimony, Trial Tr., Vol. II, 403:18-405:3.*

19. Until July 29, 2015, the day of the kickoff meeting, Wagner had assumed McCall's work on the IRB project would be included as part of Midway's services under the Consulting Agreement. On the day of the "kickoff" meeting, McCall informed Bruce Wagner that he believed that the IRB services were outside the scope of Midway's Consulting Agreement with Wagner. *Wagner Testimony, Trial Tr., Vol. II, 404:17-22; Pomeroy Testimony, Trial Tr., Vol. II, 310:24-311:1.*

20. At that time, Bruce Wagner responded that he was unsure if the services were outside the scope of the Consulting Agreement, that he would look into it and that he would treat McCall fairly. There was no discussion of compensation methodology if the IRB services be found to fall outside the scope of the Consulting Agreement. *Wagner Testimony, Trial Tr., Vol. II, 404:15-25.*

21. The parties have since stipulated that the compensation that is owed to Midway for the IRB work performed by McCall is separate, apart and distinct from the written Consulting Agreement. *Undisputed.*

22. There were no further discussions regarding compensation for work performed by Midway in obtaining the IRBs until October 15, 2015. *Undisputed.*

23. Wagner Equipment authorized McCall to represent Wagner in communications with professional staff and elected officials of the County, with the objective of obtaining the County's approval of the IRBs for its proposed new manufacturing facility. *Pomeroy Testimony, Trial Tr., Vol. II, 293:25-294:17.*

24. Between late July 2015 and late October 2015, Midway performed services in connection with Wagner's IRB application on a part-time basis with McCall expending somewhere between 65 and 80 hours in that endeavor. *McCall Testimony, Trial Tr., Vol. I, 148:4-11.*

25. Midway successfully addressed concerns raised by County Commissioner Hart Stebbins as to the potential negative impact of the issuance of any IRBs on one of Wagner's competitors, John Deere Tractor. *Pomeroy Testimony, Trial Tr., Vol. II, 295:12-296:9.*

26. Commissioner Debbie O'Malley expressed opposition towards the issuance of IRBs and refused to meet with McCall, but she did not attend the Board of County Commission meeting at which Wagner's IRB application was considered. *McCall Testimony, Trial Tr., Vol. I, 65:21-9-66:1; 60:3-6.*

27. In fact, at the time Wagner had applied for the IRBs, some commissioners expressed serious reservations about the entire IRB program which have since been

addressed by the County's adoption of additional procedures and policy changes. *Marcos Gonzales Testimony, Trial Tr., Vol. II, 463:21-464:18.*

28. McCall frequently engaged in discussions and negotiations with the Bernalillo Economic Development staff including Director Mayling Garcia and then-Economic Development Manager Marcos Gonzales. *McCall Testimony, Trial Tr., Vol. I, 143:1-7; Gonzales Testimony, Trial Tr., Vol. II, 450:25-451:17.*

29. After engaging in these negotiations, Midway and the Economic Development staff arrived at certain terms for the issuance of Wagner's IRBs including:

    a. increasing the percentage tax abatement of Wagner's taxes from the usual 75-80 percent to 85 percent;

    b. abatement on gross receipts of 100 percent;

    c. abatement on equipment taxes of 90 percent;

    d. a maximum term of 30 years for the IRBs, although the County staff had initially discussed setting the term at 20 or 25 years; and

    e. reducing payment of the County's Administrative Fees down from $100,000 to $50,000. *McCall Testimony, Trial Tr., Vol. I, 58:1-59:5.*

30. Midway successfully negotiated a total waiver of the impact fee, resulting in a savings of $205,000.00 to Wagner. However, obtaining a waiver of impact fees is a process separate of the IRB program. *McCall Testimony, Trial Tr., Vol. I, 59:9-21; Gonzales Testimony, Trial Tr., Vol. II, 455:7-13; Bendicksen Testimony, Trial Tr., Vol. I, 191:3-11.*

31. At a regular meeting of the Bernalillo County Commission, on October 27, 2015, Wagner's IRB application was unanimously approved 4-0 through the adoption of

an ordinance. The Commission's findings included that the IRBs were in the public interest. No formal opposition to Wagner's application was voiced during the meeting. *Gonzales Testimony, Trial Tr., Vol. II, 458:16-20; Wagner Exhibit M.*

### C. At Issue – Compensation for McCall's Work on the IRBs

32. Midway admits that, at least prior to October 15, 2015, the parties had no mutual agreement regarding what Midway would be paid for McCall's IRB work. *McCall Testimony, Trial Tr., Vol. I, 68:10-68:13; 73:20-23.*

33. Prior to approval of the IRBs, Bruce Wagner had expressed reservations about pursuing IRBs because they required Wagner to deed over the real property to the County for the duration of the bonds. He was concerned this could violate certain covenants Wagner had with its banks. *Wagner Testimony, Trial Tr., Vol. II, 426:5-12; Exhibit 15 (e-mail chain of October 14, 2015); Eldridge Testimony, Trial Tr., Vol. II, 433:23-434:16.*

34. Concerned that Wagner might abandon the IRB process, McCall flew to Denver in order to be physically present at Wagner's offices for an October 15, 2015 afternoon conference call with Bernalillo County representatives. *Exhibit 15.*

35. Prior to McCall's arrival, discussions with Wagner's bond counsel, Perry Bendicksen, alleviated Bruce Wagner's concerns about the bank covenants. *Eldridge Testimony, Trial Tr., Vol. II, 434:12-21.*

36. After the conference call, McCall met with Bruce Wagner, Kevin Pomeroy and Cody Eldridge at which time McCall immediately brought up how he should be compensated for his work on the IRBs. *Eldridge Testimony, Trial Tr., Vol. II, 427:20-428:4.*

37. McCall proposed a contingency fee as a methodology for payment which was "flatly refused" by Defendant. *Cody Eldridge Testimony, Trial Tr., Vol. II, 427:10-428:18, 430:1-12, 431:23-24.*

38. To the extent that Cody Eldridge explained the percentage methodology it used for payment to tax consultants (i.e., a percentage of reduced tax burden after successfully protesting a property's evaluation), that explanation came at McCall's request and not as a proposal for calculating compensation to Midway. *Cody Eldridge Testimony, Trial Tr., Vol. II, 428:6-18, 431:25-432:7.*

39. Wagner made no counterproposal for calculating compensation to Midway for McCall's IRB work at the October 15, 2015 meeting although McCall pushed hard for a resolution of the issue. By the end of the meeting, the parties were at an impasse. *Eldridge Testimony, Trial Tr., Vol. II, 429:23-430:8.*

40. McCall e-mailed the Wagner meeting participants the very next day – October 16, 2015 – and made no reference whatsoever to any agreement regarding compensation for the IRB work. *Exhibit K; McCall Testimony, Trial Tr. Vol. I, 155:1-16.*

41. It was not until more than a year later – on December 13, 2016 – that McCall asserted that Midway was entitled to payment for, among other things, its work on the IRB application and indicated that McCall had accepted a proposal by Cody Eldridge, Defendant's executive vice-president, that Midway be paid "18% of all savings for property tax reduction." *Exhibit 23 at 1.*

42. In that December 13, 2016 e-mail, McCall stated, "it is a good idea to memorialize all of these agreements in writing, particularly the [IRB work compensation]

on which will pay out as and when Wagner realizes its benefits each year over thirty years." *Exhibit 23 at 2.*

43. By responsive e-mail dated December 21, 2016, Michael Quirk, on behalf of Defendant Wagner, informed Midway that "there were no agreements, written or verbal, reached between Wagner and you for compensation in [the IRB] process." *Exhibit 24.*

44. Nonetheless, Wagner offered in that e-mail to offset money it felt had been overpaid (approximately $60,000) on the Consulting Agreement as full payment for Midway's IRB services. *Exhibit 24.*

45. After this lawsuit was filed and Arbitrator Leslie C. Smith issued the September 13, 2017 Arbitrator's Award on the dispute regarding the Consulting Agreement, Wagner submitted an unconditional $21,000.00 check "for payment of Midway's services in connection with the IRBs on Wagner's new facility." It has not been cashed. *Exhibits 26, Y; Wagner Testimony, Trial Tr., Vol. II, 411:10-12.*

46. The $21,000.00 amount was calculated by Wagner based upon the number of actual hours (65-80) McCall testified at his deposition that he had spent working on the IRBs for the South Valley project multiplied by what Wagner considers a fair hourly rate when compared to the rate charged by its attorneys. *Wagner Testimony, Trial Tr., Vol. II, 410:16-411:9; McCall Testimony, Trial Tr., Vol. I, 148:4-11.*

47. When working for third-parties, McCall has almost always worked on a flat-fee or commission-fee basis; he has never worked on an hourly-fee basis. *McCall Testimony, Trial Tr., Vol. II, 52:8-15.*

48. Since his work for Wagner, McCall worked on a flat-fee basis when he successfully sought IRBs for a partnership called One Central Associates, LLC for

which he charged them $175,000.00. *McCall Testimony, Trial Tr., Vol. I, 131:4-132:2; Exhibit W at 10-11.*

## III. Credibility Findings

49. Although McCall's verified answers to interrogatories indicate that he was paid $150,000.00 for his IRB work for One Central, LLC, *Exhibit W at 4,* his testimony at trial that he was paid $175,000.00 for that work is more credible because he articulated how that flat-fee amount was calculated (one half of one percent of the total bonds sought - $35,000,000). *McCall Testimony, Trial Tr., Vol. I, 134:7-135:19.*

50. Midway's allegation that Wagner agreed to an 18% contingency fee is not credible, for numerous reasons:

a. McCall, as well as Wagner's representatives, are all sophisticated businessmen. *McCall Testimony, Trial Tr., Vol. I, 45:7-16; Wagner Testimony, Trial. Tr., Vol. II, 398:17-21;*

b. by Midway's own calculations, Wagner's tax savings under the IRB for the 30-year life of the bonds ($20,000,000) would have resulted in exorbitant compensation of $3,600,000 to Midway. *McCall Testimony, Trial Tr., Vol. I, 70:6-8;*

c. yet McCall informed Bruce Wagner at the beginning of the IRB project that he was "willing to take a percentage fee" of Wagner's tax savings" because he didn't want Wagner to fear that McCall would charge Wagner "some gigantic fee" for Midway's IRB work. *McCall Testimony, Trial Tr., Vol. I, 152:12-15*;

d. it is not credible that the parties would have agreed to a fee arrangement worth $3.6 million without requiring a written agreement;

e. the parties' prior course of dealing indicates that if they had agreed to a fee, this arrangement would have been reflected in writing;

f. however, McCall's email to Wagner dated October 16, 2015 contains no mention of any fee agreement supposedly reached the previous day. *Exhibit K*;

g. at the time Midway sought to negotiate its fee on October 15, 2015, there was virtually no risk that the County would reject Wagner's IRB application. Midway never doubted that the County would offer the IRBs. *McCall Testimony, Trial Tr., Vol. I, 149:17-20*;

h. it is contrary to logic that Wagner would agree to pay Midway a significant contingency fee, conditioned on the outcome of the County's decision on the IRBs, when the outcome was already virtually certain;

i. when Wagner pays property tax consultants on a contingency fee, they are based upon only one to three years' worth of tax savings. *Pomeroy Testimony, Trial Tr., Vol. II, 362:1-20; Eldridge Testimony, Trial Tr., Vol. II, 428:9-16*;

j. prior to December 2016, there had been no effort by McCall to memorialize in writing any mutual understanding regarding compensation that McCall alleges was reached fourteen months earlier on October 15, 2015 at Wagner's Aurora, Colorado offices. *Undisputed*; and

k. when McCall and Bruce Wagner discussed McCall's provision of development consulting services in early 2015, McCall advised Mr. Wagner, "if you want me to go to work for you, I need a contract." McCall proceeded to prepare the draft Consulting Agreement for Wagner's review. *McCall Testimony, Trial Tr., Vol. I, 55:1-2; 155:9-16; Pomeroy Testimony, Trial Tr., Vol. II, 417:17-418:4.*

51. At no time during the performance of Midway's duties regarding the IRBs did Wagner discuss or propose that it would pay Midway an hourly rate for the time invested in the project by McCall. *Undisputed.*

**IV. Plaintiff's Allegations of Unclean Hands**

52. Wagner engages in more than 1,000 contracts each year. *Wagner Testimony, Trial Tr., Vol. II, 411:13-412:3.* Plaintiff relies on three of these transactions for the proposition that Defendant Wagner has a pattern and practice of accepting the benefit of services of independent contractors, while offering agreements and assurances about compensation, only to refuse to compensate such independent contractors, claiming that there was no agreement memorializing the amount of compensation, or that Wagner had the right to disregard the promise to compensate. The Court makes the following findings as to those transactions.

**A. Dirt Removal Contract**

The written contract between Curtis Slade and Wagner, which McCall helped prepare, allowed Mr. Slade to continue removing soil associated with remediation efforts on the South Valley property. *Exhibit Z; Pomeroy Testimony, Trial Tr., Vol. II, 284:25-285:2; 323:22-323:25.* By its terms, the contract was good for only 90 days, and the "cease and desist" letter drafted by McCall for Wagner confirmed its expiration as of that date. Exhibits Z, BB and CC. At no time did any Wagner employee call the Sheriff's Department to remove Mr. Slade from the South Valley property. *Pomeroy Testimony, Trial Tr., Vol. II, 325:8-9.*

**B. Commission Involving Sale of Wagner's Farmington Property**

Wagner had entered into a listing agreement, providing that it would pay a real estate broker a specified commission if its Farmington property was sold through a cash sale. *Exhibit AA; Sigmon Testimony, Trial Tr., Vol. I, 314:18-315:11.* Because the transaction presented by the broker instead required owner financing – a change that carries greater risk – Wagner sought to reduce the commission rate for the broker. *Exhibits 27, AA; McCall Testimony, Trial Tr., Vol. I, 257:16-259:2; Pomeroy Testimony, Trial Tr., 316:5-316:10.* When the broker protested, Bruce Wagner – who was not aware of the signed listing agreement – stated that Wagner would pay the original commission rate. *Exhibit 27; Pomeroy Testimony, Trial Tr., Vol. II, 316:17-21.* The entire disagreement was resolved in a single day. *Exhibit 27.*

### C. Sale of Wagner's Facility and Land on Osuna Drive

Wagner authorized and encouraged the Allen & Sigmon Brokerage Firm to market its existing Osuna facility to prospective buyers, inducing that firm to devote time, resources and expertise. *Lance Sigmon Testimony, Trial Tr., Vol. I, 210-240.* There was no written listing agreement as to that property although the brokers had requested one calling for a 6% commission which the brokers had incorporated into the negotiated purchase price. *Sigmon Testimony, Trial Tr., Vol. I, 218:18-219:24; 220:24-222:14.* Wagner wanted to reduce the commission payable to Allen & Sigmon from the anticipated amount to 3% and engaged McCall to negotiate that reduction at discussions on April 7, 2015, relating to the sale of the Osuna facility to Albuquerque Public Schools (APS*). Sigmon Testimony, Trial Tr., Vol. I, 227:13-228:4, 228:16-229:6; Pomeroy Testimony, Trial Transcript, Vol. II, 384:14-25.* Just two days after that

meeting, Wagner further attempted to rescind the verbal commission agreement completely. *Exhibit 4.*

Wagner, relying on its position that the 3% commission deal was not in writing, later sought to renegotiate and the parties agreed to a 2.25% commission for the sale of the Osuna property to APS. *Exhibit 28; Sigmon Testimony, Trial Tr., Vol. I, 237:13-238:11.* No commission has yet been paid to the brokers because the New Mexico Board of Educational Finance does not allow lease-back arrangements which was an original term of the agreement. Therefore, the parties reached an unusual solution to defer closing on the Osuna property for five years with APS depositing $4 million in earnest money, refundable for cause as defined in their agreement. *Pomeroy Testimony, Trial Tr., Vol. II, 385:1-386:20.*

## CONCLUSIONS OF LAW

1. Jurisdiction over the parties and the subject matter are proper in this court. *Undisputed; Pretrial Order.*

2. Venue is appropriate in this court. *Undisputed; Pretrial Order.*

3. In this diversity-based action, the Court must apply the substantive law of the State of New Mexico. *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 78 (1938); *Tucker v. R.A. Hanson Co.*, 956 F.2d 215, 217 (10th Cir. 1992).

4. Midway's work towards obtaining a waiver of impact fees falls outside of the IRB process and was within the scope of the Consulting Agreement which is not at issue in this litigation since disputes regarding that agreement were resolved by arbitration.

5. There was no meeting of the minds as to the compensation Midway should receive for McCall's work on obtaining the IRBs. The parties did not reach any understanding regarding Midway's compensation at the time its services commenced. Then a bona fide dispute arose between the parties regarding the amount due.

6. Moreover, the compensation arrangement sought by Midway would violate the public policy of New Mexico. Even if the parties had reached a contingency agreement for that work, Midway could not recover any damages for breach of such a contract as sought in Count I. Enforcement of a contingency contract under the circumstances set forth in this case would violate the public policy of the State of New Mexico. *See Memorandum Opinion and Order Granting Partial Summary Judgment (Doc. No. 52), entered November 21, 2018.*

7. Midway's remaining claims for unjust enrichment (Count II) and quantum meruit (Count III) offer a way of providing compensation outside of a contract (e.g., when a contract has been found void, or where a purported contract is insufficiently definite). *See, e.g., Armijo v. Cebolleta Land Grant*, 1987-NMSC-006, ¶ 10 (stating that "although contracts may be voided solely because they are against public policy, the claimant may still recover in quantum meruit"); *Adm'rs of the Tulane Educ. Fund v. Ipsen Pharma, S.A.S.*, 771 F. Supp. 2d 32, 41 (D.C. Cir. 2011) (stating that a "claim of unjust enrichment is appropriate where an agreement is too indefinite to be enforced . . . [or] where no contract is made because each of the parties had a materially different understanding of the terms") (citations and quotations omitted).

8. Unjust enrichment and quantum meruit do not constitute distinct causes of action. The New Mexico courts consider unjust enrichment and quantum meruit to be

"essentially the same." *Hydro Conduit Corp. v. Kemble*, 1990-NMSC-061, ¶ 21 (citation and quotation omitted); *see also Ontiveros Insulation Co., Inc. v. Sanchez*, 2000-NMCA-051, ¶ 11 (noting that "New Mexico has long recognized actions for unjust enrichment, that is, in quantum meruit or assumpsit"); *Credit Inst. v. Veterinary Nutrition Corp.*, 2003-NMCA-10, ¶ 21 (noting that "[a] claim for restitution is . . . rooted in principles of quasi-contract or quantum meruit, and its principal objective is to prevent unjust enrichment").

9. Here, Wagner has knowingly benefited from the performance of services by Midway in negotiating and securing the IRB approvals.

10. Wagner has therefore been unjustly enriched by retaining the benefit of Midway's services without providing compensation for the services performed.

11. The remedy applicable to Midway's claims for unjust enrichment and quantum meruit is restitution.

12. Midway contends that the proper method for calculating restitution looks to the gain or benefit conferred on Wagner. Midway asserts that it is therefore entitled to the present value of 18% of the tax savings to be realized by Wagner over the 30-year life of the IRBs (calculated by Midway to be between $859,415.97 and $1,537,245.00). The Court finds, however, that Midway's proposed compensation model is an attempt to sidestep the public policy of New Mexico through this reformulation. When there is a conflict between "the policy against unjust enrichment, on the one hand, and the policy that prohibits the underlying transaction, on the other . . . private claims based on unjust enrichment yield to public policy objectives." Restatements of the Law 3d, Restitution and Unjust Enrichment, § 32 cmt. b (3rd 2011).

13. Midway is not entitled to a restitution award based on any percentage of Wagner's total tax savings under the IRBs or on a percentage of the savings Midway allegedly obtained for Wagner over and above the typical IRB.

14. A "'benefit' for purposes of an unjust enrichment claim . . . includ[es] the advantage of being saved from an expense or loss." *Martin v. Comcast Cablevision Corp. of Cal., LLC,* 2014-NMCA-114, ¶¶ 13 (citation and quotation omitted). Here, the advantage that Midway conferred on Wagner can best be measured by considering the expense Wagner avoided by not being required to hire another consultant to perform services in connection with the IRB application. "[T]he market value of [a] benefit" is a recognized method for calculating restitution. Restatements of the Law 3d, Restitution and Unjust Enrichment, § 49 (3rd 2011). A party seeking restitution is entitled to the reasonable value of the services provided or the increased value to the other party from those services, whichever is smaller. *See Cano v. Lovato,* 1986-NMCA-043, ¶¶ 63-64.

15. Wagner's proposal of using an hourly rate charged by an attorney to calculate the fair market value of McCall's services does not take into account his experience in real estate development, negotiations and past dealings with Bernalillo County Commissioners and other representatives.

16. The only evidence before this Court as to the market value of providing, among other things, negotiation services associated with an IRB application by a development consultant with the knowledge, experience and familiarity with the decisionmakers as that of McCall is the flat fee paid for such services by One Central, LLC to McCall.

17. Although McCall spent less time on the One Central project (approximately 20 hours) and the fee was calculated as a percentage of the face amount of the bonds for that project, the same negotiating and lobbying efforts were involved and a non-contingent flat fee of $175,000 applied. A flat fee method of payment is necessarily independent of the number of hours it takes to fully perform the tasks to complete the goal – in this case, approval and issuance of IRBs.

18. Therefore, Plaintiff is entitled to $175,000.00 as restitution as compensation for McCall's IRB work on Wagner's South Valley project.

19. The Court finds no bad faith by Wagner in association with the sale of the Farmington property or termination of the Slade soil removal contract at the expiration of ninety days as was contemplated. The Court finds Wagner's conduct in seeking to renegotiate the brokers' orally agreed upon commission as to the sale of the Osuna property to be troubling, but insufficient to support the finding of a bad faith pattern and practice of repudiating contractual obligations. Thus, to the extent punitive damages might be available on an unjust enrichment claim, they are not warranted in this case.

20. Final judgment will be entered for Plaintiff Midway Leasing, Inc. and against Defendant Wagner Equipment Co. in the sum of $175,000.00.

_____
UNITED STATES MAGISTRATE JUDGE
Presiding by Consent